**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

SWEDISH INSTITUTE INCORPORATED,

Plaintiff,

v.

LINCOLN EDUCATIONAL SERVICES
CORPORATION and
DERRICK RUFFIN,

Defendants.

CASE NO. _____
1:26-cv-05955

## <u>COMPLAINT</u>

Plaintiff Swedish Institute Inc. ("Swedish Institute") hereby file this Complaint against

Lincoln Educational Services Corporation ("Lincoln") and one of its senior executives Derrick

Ruffin seeking an immediate Temporary Restraining Order ("TRO"), preliminary and permanent

injunctive relief, and monetary damages.

## I.   <u>NATURE AND SUMMARY OF THE ACTION</u>

1.    This case involves the blatant, calculated, and deliberate theft of Swedish Institute's

confidential information and trade secrets by Derrick Ruffin, Swedish Institute's Chief Operating

Officer, in connection with his departure to work as President for its direct competitor, Lincoln.

2.    Forensic records show that Mr. Ruffin repeatedly accessed Swedish Institute's

trade secrets for an obvious purpose: to help himself and Lincoln establish a new campus and

compete with Swedish Institute.

3.    Swedish Institute and Lincoln compete in the market for career and technical

postsecondary education.

4.    From 2019–2026, Mr. Ruffin was a senior executive of the Swedish Institute,

ultimately serving as its Chief Operating Officer.

1

5. Mr. Ruffin's last day of employment with Swedish Institute was on March 16, 2026, after which he joined Swedish Institute's direct competitor Lincoln as the President of a new campus location in Hicksville, NY.

6. After reviewing Mr. Ruffin's electronic records, Swedish Institute recently discovered that he repeatedly accessed its systems and took highly sensitive trade secrets—including months after his departure, while serving as President of a new competing campus he is setting up for Lincoln.

7. Swedish Institute has detailed records of the numerous attempts that Mr. Ruffin made to log into Swedish Institute's systems well after his employment ended, including his last known successful login on June 25, 2026:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6/25/2026, 5:58:38 PM | ea2db35c-ab43-4a9... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Rosedale, New York, .. |
| 6/25/2026, 5:56:37 PM | 10172f8e-3fba-4b3d... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Rosedale, New York, .. |
| 6/25/2026, 5:56:37 PM | d1b8494b-25f9-479... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Rosedale, New York, .. |
| 6/25/2026, 1:56:28 PM | 6bc3709d-c747-4a6c... | Derrick Ruffin | Windows Sign In | Success | 0 | 67.80.37.4 | Rosedale, New York, .. |
| 6/22/2026, 3:06:46 PM | dabcee8f-557b-4b87... | Derrick Ruffin | One Outlook Web | Success | 0 | 67.80.37.4 | Rosedale, New York, .. |
| 6/22/2026, 3:05:50 PM | e34c3d44-b3ea-488... | Derrick Ruffin | Windows Sign In | Success | 0 | 67.80.37.4 | Rosedale, New York, .. |
| 6/20/2026, 1:47:45 PM | aef5a5b4-eff5-43f2-... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Rosedale, New York, .. |
| 6/20/2026, 1:47:44 PM | bc2448d5-bfbb-41d... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Rosedale, New York, .. |
| 6/16/2026, 7:57:47 AM | 6c642bcd-9230-4d8... | Derrick Ruffin | Microsoft Authentica... | Success | 0 | 129.7.55.20 | Houston, Texas, US |
| 6/16/2026, 7:57:47 AM | e9767a46-71bb-46d... | Derrick Ruffin | Outlook Mobile | Success | 0 | 129.7.55.20 | Houston, Texas, US |
| 6/10/2026, 12:01:31 ... | 612fe619-3197-4e66... | Derrick Ruffin | Windows Sign In | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 6:58:42 PM | 7ff0cf13-2ff0-4a72-b... | Derrick Ruffin | Microsoft Account C... | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 6:58:42 PM | 7ff0cf13-2ff0-4a72-b... | Derrick Ruffin | Microsoft Account C... | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 6:58:39 PM | 9bf38aba-0355-4ee5... | Derrick Ruffin | My Profile | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 5:54:17 PM | 54ea8e08-16ea-49b... | Derrick Ruffin | Windows Sign In | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 5:54:11 PM | 38e21579-9016-438... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 5:54:11 PM | 7d1d068f-c488-487a... | Derrick Ruffin | Windows Sign In | Failure | 50126 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 5:54:03 PM | f14feb22-bf92-412c-... | Derrick Ruffin | Microsoft Office | Success | 0 | 67.80.37.4 | Queens Village, New.. |
| 6/9/2026, 11:07:04 AM | 3ade2075-1e6f-4688... | Derrick Ruffin | Windows Sign In | Success | 0 | 67.80.37.4 | Queens Village, New.. |

8. Mr. Ruffin targeted and took highly sensitive documents that would be helpful in setting up a competing campus and marketing to new students, for example, Swedish Institute's:

- "Marketing Bible," the company's detailed annual marketing playbook;

2

- "Nursing Leads with Emails 1.1.2017 to 11.11.2019," a non-public list of the name and email address of ***4,890*** curated potential student leads;

- Student lists, including students' contact information, Social Security Numbers, enrollments, and paid and owed account balances; and

- Documents showing Swedish Institute employee job descriptions, salaries, and performance goals.

9.     Mr. Ruffin also engaged in a campaign to raid Swedish Institute's best performers from its Admissions Department through improper solicitations, in violation of his contractual and fiduciary obligations, to join his new employer Lincoln.

10.     In addition, Mr. Ruffin has violated his non-compete term by working for direct competitor Lincoln as the President of Lincoln's new Hicksville, NY campus and by accessing and retaining Swedish Institute's trade secrets while actively working for Lincoln and setting up its new campus.

11.     All of that misconduct violates Mr. Ruffin's January 16, 2025 Amended and Restated Employment Agreement as well as applicable federal and state law.

12.     The trade secrets Mr. Ruffin stole are exactly the documents and information he could use to compete unfairly with Swedish Institute, including by building Lincoln's new campus using confidential materials and business intelligence that Swedish Institute invested in and developed for its own use—not that of its competitors.

13.     Swedish Institute respectfully asks the Court to enter a TRO—and ultimately preliminary and permanent injunctive relief and monetary damages—enjoining Ruffin and Lincoln from retaining or using Swedish Institute's trade secrets or confidential information, soliciting Swedish Institute employees, and improperly competing against Swedish Institute, including through Mr. Ruffin's continued employment by Lincoln.

14.    Swedish Institute is also, contemporaneously with filing this Complaint, moving the Court to order expedited discovery and a computer forensics protocol so that Swedish Institute can determine the full extent to which Mr. Ruffin and/or Lincoln has misappropriated Swedish Institute's trade secrets and confidential information.

## II.    PARTIES, JURISDICTION, AND VENUE

15.    Plaintiff Swedish Institute Incorporated ("Swedish Institute") is and has been at all pertinent times for this lawsuit a corporation organized and existing under the laws of the State of New York with its principal place of business at 151 West 26th Street, New York, NY 10001.

16.    Defendant Derrick Ruffin is an individual citizen of New York residing at 2763 2nd Place, Baldwin, New York 11510-4040.  Mr. Ruffin can be served at that address.

17.    Defendant Lincoln Educational Services Corporation ("Lincoln") is and has been at all pertinent times for this lawsuit a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 14 Sylvan Way, Suite A, Parsippany, NJ 07054.  Lincoln can be served through its registered agent Alexandra Luster at 14 Sylvan Way, Suite A, Parsippany, NJ 07054.

18.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States.  Specifically, Plaintiff's claims assert violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal question claims in this action that they form part of the same case or controversy and arise out of a common nucleus of operative facts.

19.    This Court has personal jurisdiction over Defendants under New York Civil

Practice Law and Rules ("CPLR") §§ 301 and 302, and the protections of Constitutional Due Process, because Defendants have purposefully availed themselves of the privilege of conducting business within the State of New York and has committed tortious acts both within the state causing injury here.  Specifically, Ruffin entered into an employment agreement with Swedish Institute that is expressly governed by New York law.  Furthermore, Plaintiff's claims arise directly out of Ruffin's specific, purposeful contacts with this District, including his misappropriation and unauthorized taking of Plaintiff's trade secrets from Plaintiff's New York operations, and Ruffin's targeted solicitation and poaching of Swedish Institute's employees located within New York, in direct violation of the Defend Trade Secrets Act and Ruffin's contractual obligations.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the misappropriation of Plaintiff's trade secrets and the solicitation of Plaintiff's employees, and because Plaintiff's principal place of business is located within this District and it suffered the injury resulting from Defendants' unlawful conduct here.

## III.    STATEMENT OF THE RELEVANT FACTS

### A.    Background

21.    Plaintiff Swedish Institute is wholly owned by Lottus Education USA Corp., which is ultimately owned by Lottus Education S.A.P.I. de C.V. (collectively "Lottus"), a prominent educational organization and consolidation platform dedicated to providing accessible, high-quality academic and vocational training.  *See https://www.lottus.com/.*  Originally established to expand higher education opportunities in Mexico, Lottus Education has steadily grown into one of the largest and most respected educational networks in that country, operating numerous campuses

and serving tens of thousands of students.

22.     Lottus focuses on transforming the lives of its students through impactful, career-driven programs that foster personal and professional development while meeting the workforce demands of modern industries.

23.     To further its strategic commitment to premium health and wellness education, in 2025, Lottus Education expanded into the United States by acquiring the Swedish Institute College of Health Sciences and Atelier Esthétique Institute of Esthetics, both headquartered in New York City.

24.     For over a century, the Swedish Institute has stood as a pioneering legacy institution in healthcare education, recognized for its rigorous training programs in massage therapy, nursing, medical assisting, and allied health sciences.

25.     As part of this strategic expansion in New York, Lottus also acquired the Swedish Institute's sister school, Atelier Esthétique Institute of Esthetics, a premier New York State-licensed academy situated in Manhattan.

26.     Since April 2019 and until his departure in March 2026, Derrick Ruffin served as a high-ranking executive at Swedish Institute.

27.     During Mr. Ruffin's seven-year tenure at Lottus/Swedish Institute, he served in increasingly critical roles, including Director of Admissions from April 2019 to March 2020; Vice President of Enrollment Operations from March 2020 to January 2021; and Chief Operating Officer from January 2021 to March 2026, where he oversaw all admissions and managed additional operational duties for the company.

28.     Mr. Ruffin had numerous direct reports at the Swedish Institute, including approximately ten admissions representatives, eight financial aid representatives, and the

Registrar.

29.    Mr. Ruffin's responsibilities at the Swedish Institute required him to oversee and have detailed knowledge of the critical commercial operations associated with reviewing potential-student leads generated from the company's marketing team, through the recruiting process, enrollment, and ultimately the start of the student's tenure at the Swedish Institute.

30.    As of January 2025, indicating his value to the company and his advancing seniority within the company, Mr. Ruffin received a substantial salary of $275,000 plus additional significant bonuses.

**B.    Mr. Ruffin Announces His Departure to a Competitor, Lincoln.**

31.    In early February 2026, Mr. Ruffin announced that he would be resigning from Swedish Institute.

32.    However, Mr. Ruffin continued working at the Swedish Institute through March 16, 2026 (the "Severance Date").

33.    Mr. Ruffin chose to leave the Swedish Institute to work for a nearby direct competitor, Lincoln, where Mr. Ruffin became the President of Lincoln's new Hicksville, New York campus that is in the process of being completed.

34.    Lincoln has publicly stated that its new 65,000 square-foot campus in Hicksville, New York is its second New York campus and is expected to begin operations towards the end of 2026.

35.    Lincoln directly operates twenty-plus campuses nationally.  Its existing New York campus in Queens is accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC")—the same accreditor as the Swedish Institute.

36.    Mr. Ruffin had previously worked for Lincoln from October 2017 to April 2019

(approximately a year and a half) before joining Swedish Institute in April 2019.

37.    Upon information and belief, Lincoln hired Mr. Ruffin in or around the first quarter of 2026.

38.    In addition to its existing Queens campus and its planned Hicksville campus, Lincoln operates a campus in Paramus, New Jersey, approximately twenty miles from Swedish Institute's Manhattan campus.  Lincoln's Paramus campus offers allied-health career training programs—including Medical Assistant, Practical Nursing, and Nursing Assistant/Patient Care— that directly overlap with the healthcare programs offered by Swedish Institute.

39.    Given its overlapping geography, similar for-profit educational offerings, and common student market, Lincoln directly competes with Swedish Institute.

40.    Further evidencing that competition, Lincoln has, upon information and belief, bid on internet-search keywords associated with Swedish Institute so that Lincoln advertisements appear to prospective students searching for Swedish Institute.

### C.    Mr. Ruffin Steals Numerous Sensitive Corporate Documents before and After He Leaves.

41.    Based on its recent investigation of Mr. Ruffin's email account and system-access data, Swedish Institute has recently discovered concrete evidence that Mr. Ruffin downloaded critical non-public corporate documents before and after his departure to join Lincoln.

42.    Mr. Ruffin accessed the system and took/retained these documents without the knowledge, permission, or authorization of Swedish Institute.

43.    Mr. Ruffin used his knowledge of Swedish Institute and conducted a targeted campaign of retrieving documents that would be helpful in opening a new campus that he would run and in competing with Swedish Institute for students.

44.    Based on what Swedish Institute knows to date before discovery in this case, Mr.

Ruffin took, for example, the following critical trade secrets.

45.     *First*, Mr. Ruffin took the Swedish Institute's "Marketing Bible." This highly sensitive internal document contains the Swedish Institute's annual marketing plan for student lead generation, identification of marketing channels, detailed budgets, goals, conversion rates, etc.

46.     *Second*, Mr. Ruffin took an Excel document titled "Nursing Leads with Emails 1.1.2017 to 11.11.2019." This is a non-public list of the name and email address of *4,890* curated potential student leads. Swedish Institute prepared this list using the results of its marketing campaigns.

47.     *Third*, Mr. Ruffin took lists of Swedish Institute students, including their contact information, Social Security Numbers, enrollments, and paid and owed account balances.

48.      *Fourth*, Mr. Ruffin took documents showing Swedish Institute employee job descriptions, salaries, and performance goals.

49.     *Fifth*, Mr. Ruffin took the Swedish Institute 2025 budget.

50.     *Sixth*, Mr. Ruffin forwarded to his personal email a Word version of the Swedish Institute's Admissions Policies and Practices on June 16, 2026, three months after he left Swedish Institute.

51.     Swedish Institute possesses electronic records showing the numerous instances between March 17 and June 25, 2026 in which Mr. Ruffin successfully and unsuccessfully accessed the Swedish Institute's Microsoft OneDrive system after his last day of employment at Swedish Institute.

52.     Because Mr. Ruffin no longer worked for Swedish Institute, he had no legitimate reason to access those confidential trade secrets other than to compete improperly with Swedish Institute as he built Lincoln's new campus as its President.

**D.      Mr. Ruffin Solicits Key Employees of Swedish Institute.**

53.      Mr. Ruffin was part of a high-level core administrative team while he worked at Swedish Institute, which included the Admissions Office.

54.      Of that 10-person team, Mr. Ruffin targeted the best performing half of that team and solicited them to join Lincoln.

55.      In at least four instances, Mr. Ruffin was successful.

56.      Mr. Ruffin solicited Swedish Institute employee Ebony Williamson.

57.      Ms. Williamson joined Swedish Institute in December 2021 and served as an Admissions Representative and then as the Associate Director of Admissions.

58.      Ms. Williamson resigned from Swedish Institute in July 2026.

59.      Upon information and belief, Ms. Williamson now works at Lincoln.

60.      Mr. Ruffin also solicited Swedish Institute employee Jennifer Smith.

61.      Ms. Smith joined Swedish Institute in February 2021 and served as an Admissions Representative.

62.      Ms. Smith resigned from Swedish Institute in July 2026.

63.      Ms. Smith now works at Lincoln.

64.      In or around March 2026, Mr. Ruffin solicited Swedish Institute employee Kia Jones.

65.      Ms. Jones joined Swedish Institute in August 2021 and served as the Enrollment Manager.

66.      For example, on March 12, 2026, and while both were still employed by Swedish Institute, Ms. Jones confirmed with Mr. Ruffin, "This position correct?" and attached the online details of a job opening with Mr. Ruffin's new employer, Lincoln.

10

**From:** Kia Jones <kbjones@swedishinstitute.edu>
**Sent:** Thursday, March 12, 2026 7:51 AM
**To:** Derrick Ruffin <druffin@swedishinstitute.edu>
**Subject: This position correct?**

Lincoln Tech

Education Supervisor

Lincoln Tech • Melrose Park, IL • via Indeed

6 days ago

80K–85K a year

Full-time

Paid time off

Dental insurance

Health insurance

Apply directly on Indeed

67.    Ms. Jones was terminated from Swedish Institute in June 2026 due to her shirking her responsibilities at Swedish Institute after Mr. Ruffin's solicitations and departure.

68.    Upon information and belief, Ms. Jones now works at Lincoln.

69.    Upon information and belief, Mr. Ruffin also solicited Swedish Institute employee Anthony Jones.

70.    Mr. Jones joined Swedish Institute in November 2020 and served as an Admissions Representative.

71.    Mr. Jones resigned from Swedish Institute in June 2026.

72.    Upon information and belief, Mr. Jones now works at Lincoln.

73.    Ruffin also attempted to solicit two additional employees from the high-performing Admissions Department.

74.    During the end of his tenure working at Swedish Institute, Mr. Ruffin approached two additional employees and solicited them to work with him at Lincoln.

75.    After talking with Mr. Ruffin, those two employees ultimately chose to stay at Swedish Institute.

11

76.     Mr. Ruffin was able to make targeted offers to the admissions representatives he solicited because, as Chief Operating Officer, he had direct knowledge of each representative's job title, salary, performance metrics, compensation structure, and capabilities.

77.     Mr. Ruffin's misappropriation of trade secrets about the Swedish Institute's students and its admission operations, as well as solicitations of key members of the Swedish Institute's Admissions team is a serious attack on the company because the Admissions Department is the critical income-generating segment of the business since the bulk of the company's revenue comes from student tuition.

78.     The Admissions representatives are critical employees because those are the people who convert potential student leads into enrolled students generating revenue for the school.

79.     While the Swedish Institute is still evaluating its damages (and cannot know the full extent of the damage before discovery given that Mr. Ruffin acted in secret), the company has suffered monetary damages following Mr. Ruffin's misappropriation, improper competition, and solicitation of the Swedish Institute's key Admissions employees.

80.     Specifically, the Swedish Institute has seen a significant reduction in revenue and EBITDA and has incurred significant additional costs to retain the employees that Mr. Ruffin solicited unsuccessfully and to replace and train new employees to replace the employees that Mr. Ruffin successfully solicited.

81.     The Swedish Institute also faces irreparable harm as Mr. Ruffin's theft of the Swedish Institute's trade secrets and other breaches are being used by Mr. Ruffin for the benefit of his new employer Lincoln in setting up a competing campus.

**E.     Mr. Ruffin's Employment Agreement Squarely Bars His Actions.**

82.     In addition to federal and New York law, Mr. Ruffin is bound by an Amended and

12

Restated Employment Agreement effective January 16, 2025 between him and Swedish Institute

Incorporated (the "Agreement"), attached hereto as Exhibit 1.

83.    The Agreement required that Mr. Ruffin devote substantially all of his efforts to the

company rather than to the company's competitors, such as Mr. Ruffin's new employer Lincoln:

> **No Other Employment; Minimum Time Commitment**. During the Period of Employment, the Executive shall (a) devote substantially all of the Executive's business time, energy and skill to the performance of the Executive's duties for Holdings and its subsidiaries (including the Company) (the "Swedish Group"), (b) perform such duties in a faithful, effective and efficient manner to the best of his abilities, and (c) hold no other employment.

Agreement ¶ 1.3.

84.    In the Agreement, Mr. Ruffin expressly acknowledged that Swedish Institute

possessed trade secrets:

> **Confidential Information; Inventions.**
> (a) The Executive recognizes that the Swedish Group's business interests require the fullest practical protection and confidential treatment of all information not generally known within the relevant trade group or by the public, including all documents, writings, memoranda, business plans, illustrations, designs, plans, processes, programs, inventions, computer software, reports, data, records, sources of supply, customer lists, supplier lists, trade secrets and all other valuable or unique information and techniques acquired, developed or used by the Swedish Group and its Affiliates in connection with their business (the "Protected Information"). **The Executive expressly acknowledges and agrees that Protected Information constitutes trade secrets and confidential and proprietary business information.** Protected Information shall not include information that is or becomes part of the public domain unless through a breach of this A&R Agreement by the Executive.

Agreement ¶ 6.1(a) (emphasis added).

85.    Mr. Ruffin also expressly acknowledged his ongoing obligation to keep Swedish

Institute's Protected Information confidential:

> Except as permitted pursuant to Section 6.1(b) or (c), the **Executive agrees to keep secret and to treat confidentially and not to, and not to permit any other Person to, directly or indirectly, appropriate, divulge, disclose or otherwise disseminate to any other Person (other than the Swedish Group's counsel) or**

13

**use in any manner for its or any other Person's purposes or benefit any**
**Protected Information. . . . This obligation of non-disclosure of information**
**shall continue to exist for so long as such information remains Protected**
**Information.** For purposes of this A&R Agreement, trade secrets are subject to the
protection of the Uniform Trade Secret Act.

Agreement ¶ 6.1(a) (emphasis added).

86.    In the Agreement, Mr. Ruffin also expressly acknowledged that his

misappropriation of a Swedish Institute trade secret could result in liability under the Defend Trade

Secrets Act and entitle the Swedish Institute to monetary and injunctive relief:

Misappropriation of a trade secret of the Swedish Group or any of its Affiliates in
breach of this A&R Agreement may subject the Executive to liability under the
Defend Trade Secrets Act of 2016 (the "DTSA"), entitle the Swedish Group or such
Affiliate to injunctive relief, and require the Executive to pay compensatory
damages, double damages, and attorneys' fees.

Agreement ¶ 6.1(c).

87.    The Agreement contained clear and reasonable terms barring Mr. Ruffin from

competing with the Swedish Institute and from soliciting its employees:

**Non-Competition; Other Restrictive Covenants.**
(a) For the period commencing on the Effective Date and ending on the twelve (12)
month anniversary of the Severance Date (such period, the "Restricted Period"),
the Executive shall not directly or indirectly: (i) engage in any capacity in the
business of the Swedish Group as of the Severance Date (the "Business"), within a
fifty (50) mile radius of any Swedish Group campus then existing (or for which
active planning has occurred as of the Severance Date) (the "Restricted Area") or
engage in the employ or otherwise on behalf of any Person engaged in the
Restricted Area in the Business or any portion of the Business (collectively, the
"Restricted Services"); or (ii) participate or engage in the management, operation
or control of, or have any financial, ownership or other interest in any Person that
engages, in the Restricted Area, in any Restricted Service, except for passive
ownership of up to 2% of the outstanding capital stock or other equity interests of
publicly traded companies.

(b) For the period commencing on the Effective Date and in perpetuity thereafter,
the Executive and the Swedish Group, shall each not directly or indirectly take any
action which is intended, or could reasonably be expected, to harm, disparage,
defame or slander the reputation of the (i) Swedish Group or any of its Affiliates or
(ii) the Executive, in each case in connection with matters related to this A&R

14

Agreement or in connection with the Business.

(c) For the Restricted Period, the Executive shall not directly or indirectly solicit, encourage or take any other action, or direct any other Person to take such action, (i) to solicit the employment or other engagement of any Person who was, as of the Effective Date or the Severance Date, an employee or independent contractor of the Swedish Group or any of its Affiliates, or (ii) solicit, encourage or induce any employees of the Swedish Group or any of its Affiliates to (x) terminate such employee's employment or relationship with the Swedish Group or its Affiliates or (y) seek to accept employment or other affiliation with any other Person . . . .

Agreement ¶ 6.2(a)–(c).

## COUNT 1: VIOLATION OF THE DEFEND TRADE SECRETS ACT
## (AGAINST MR. RUFFIN)

88.     Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

89.     The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836.

90.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).

91.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of

15

another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

92.     Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

93.     Swedish Institute has an advantage over its competitors based, in part, on the trade secrets it has developed and implemented in its business efforts.

94.     Swedish Institute owns and possesses certain confidential, proprietary, and trade secret information as alleged above. Swedish Institute has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, including by limiting their access to current employees and by keeping them on password-protected platforms and devices not generally accessible by the public.

95.     Swedish Institute's trade secrets include, but are not limited to:

16

- Student enrollment records and files, including student names, Social Security numbers and account balances;

- Employee performance data, including admissions representatives' goals, targets and compensation information;

- Program pricing and run rates;

- Marketing strategies and materials, including Swedish Institute's "Marketing Bible" and lead conversion data;

- Admissions policies and operational procedures; and

- Budget, strategy documents and program spending information.

96.     Swedish Institute's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who can obtain economic value from their disclosure or use.  Accordingly, the Swedish Institute's trade secrets constitute "trade secrets" under the DTSA.

97.     Mr. Ruffin was under a duty to keep Swedish Institute's trade secrets confidential and not use or disclose such information except for the benefit of Swedish Institute.  Paragraph 6.1(a) of the Agreement required Mr. Ruffin to "keep secret and to treat confidentially and not to . . . permit any other Person to, directly or indirectly, appropriate, divulge, disclose or otherwise disseminate to any other Person . . . or use in any manner for its or any other Person's purposes or benefit any Protected Information."  Mr. Ruffin expressly acknowledged and agrees that the Protected Information "constitutes trade secrets and confidential and proprietary business information." *Id.*

98.     Mr. Ruffin violated the DTSA by misappropriating Swedish Institute's trade secrets which were used in, or intended for use in, interstate or foreign commerce.

99.    Mr. Ruffin's misappropriation of Swedish Institute's trade secrets includes but is not limited to: (a) forwarding and retaining confidential, proprietary trade secret information to his personal email address (derrickruffin@yahoo.com) both before and after the termination of his employment; (b) accessing Swedish Institute's password-protected systems after his separation on March 16, 2026, without authorization and without any legitimate Swedish Institute purpose; (c) downloading and reviewing trade secrets from Swedish Institute's OneDrive system after his departure; and (d) upon information and belief, using and disclosing Swedish Institute's Trade Secrets to benefit himself and his new employer, Lincoln.

100.    Upon information and belief, Mr. Ruffin has used or intends to use Swedish Institute's trade secrets for his own benefit and for the benefit of Lincoln, and to Swedish Institute's detriment, without the express or implied consent of Swedish Institute.

101.    Mr. Ruffin repeatedly accessed and took trade secrets from Swedish Institute while being actively employed by Lincoln as the President of one of Lincoln's new campuses.

102.    Mr. Ruffin's misappropriation was willful and malicious.

103.    As a direct result of Mr. Ruffin's misappropriation of its trade secrets, Swedish Institute has suffered and, if Mr. Ruffin's conduct is not stopped, continues to suffer irreparable injury and competitive harm for which there is no adequate remedy at law. Swedish Institute has also suffered and continues to suffer monetary damages that will be proven at trial.

104.    The DTSA specifically authorizes courts to award injunctive relief to prevent the actual or threatened misappropriation of trade secrets. Swedish Institute seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Swedish Institute's business operates in a competitive market and will continue suffering

18

irreparable harm absent injunctive relief.

105.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to an award of injunctive relief, damages and attorneys' fees.

## COUNT 2: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (AGAINST MR. RUFFIN)

106.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

107.    The Computer Fraud and Abuse Act ("CFAA") provides a civil cause of action against any person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).

108.    A "protected computer" includes a computer "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B).

109.    Swedish Institute's computer systems, including its email systems, OneDrive cloud storage, and internal databases, are "protected computers" within the meaning of the CFAA because they are used in and affect interstate commerce and communication.

110.    Mr. Ruffin's employment with Swedish Institute terminated on March 16, 2026. After that date, Mr. Ruffin no longer had any right to access Swedish Institute's email and information systems unless expressly authorized by Swedish Institute.

111.    Despite knowing that he no longer worked there, had no right to access or use the company's systems and trade secrets, and having been informed that he was not allowed to access Swedish Institute's systems, Mr. Ruffin intentionally and on numerous occasions without authorization continued to access Swedish Institute's protected computers after March 16, 2026, and thereby obtained Swedish Institute's confidential, proprietary, and trade secret information.

19

112.    Swedish Institute may maintain this civil action pursuant to 18 U.S.C. § 1030(g) because Mr. Ruffin's conduct caused loss to Swedish Institute aggregating at least $5,000 in value during a one-year period.  *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

113.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to economic damages, injunctive relief, and other equitable relief pursuant to 18 U.S.C. § 1030(g).

### <u>COUNT 3: BREACH OF CONTRACT: NON-COMPETE</u><br><u>(AGAINST MR. RUFFIN)</u>

114.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

115.    Mr. Ruffin is bound by an Amended and Restated Employment Agreement effective January 16, 2025 between him and Swedish Institute Incorporated (the "Agreement"), *see* <u>Exhibit 1</u>.

116.    Mr. Ruffin continues to be bound by the Agreement, for which he received adequate consideration, including continued employment, a salary of $275,000 per year, eligibility for annual bonuses, and a potential loyalty bonus of $125,000.

117.    The Agreement was executed in connection with—and was expressly conditioned upon the closing of—the acquisition of Swedish Institute by Lottus Education under a Bill of Sale dated December 18, 2025.  The restrictive covenants in the Agreement were a bargained for component of that transaction.  *See* Agreement ¶¶ 5.5(e), 5.5(j), and 14.

118.    Paragraph 6.2(a) of the Agreement provides that during the Restricted Period — the twelve months following Ruffin's Severance Date — Mr. Ruffin shall not

> directly or indirectly: (i) engage in any capacity in the business of the Swedish Group as of the Severance Date (the 'Business'), within a fifty (50) mile radius of any Swedish Group campus then existing (or for which active planning has

occurred as of the Severance Date) (the 'Restricted Area') or engage in the employ or otherwise on behalf of any Person engaged in the Restricted Area in the Business or any portion of the Business (collectively, the 'Restricted Services'); or (ii) participate or engage in the management, operation or control of, or have any financial, ownership or other interest in any Person that engages, in the Restricted Area, in any Restricted Service[.]

119.    Mr. Ruffin's Severance Date was March 16, 2026. The Restricted Period therefore extends through March 16, 2027.

120.    The Restricted Period began on the Effective Date of the Agreement. The non-competition covenant, therefore, governed Mr. Ruffin's conduct both while he remained employed by Swedish Institute and during the twelve months following his Severance Date.

121.    Swedish Institute's campus is located at 151 West 26th Street, New York, NY 10001.

122.    Mr. Ruffin accepted employment with Lincoln as Campus President of Lincoln's planned Hicksville, New York campus, which is located approximately twenty-five miles from Swedish Institute's Manhattan campus, well within the Restricted Area. Lincoln also operates an existing campus in Queens, New York, approximately ten miles from Swedish Institute's campus, and a campus in Paramus, New Jersey, approximately twenty miles away. All three Lincoln locations fall within the Restricted Area.

123.    Upon information and belief, Mr. Ruffin accepted his position with Lincoln in the first quarter of 2026, possibly while he remained employed by Swedish Institute. Mr. Ruffin's acceptance of employment with Lincoln and work for Lincoln violates ¶ 6.2(a) of the Agreement. And to the extent that Mr. Ruffin engaged in competitive acts before his departure, that misconduct violates ¶ 1.3 of the Agreement, in which Mr. Ruffin agreed to devote substantially all of his business time, energy, and skill to the Swedish Institute and to "hold no other employment" during the Period of Employment.

21

124.    The "Business" under the Agreement means the business of the Swedish Institute as of the Severance Date.  As of March 16, 2026, the Swedish Institute operated ACCSC-accredited, for-profit postsecondary institutions providing career-oriented education and vocational training in healthcare and wellness fields, including programs in nursing, medical assisting, sonography, surgical technology, healthcare administration, massage therapy, and esthetics, serving the New York metropolitan student market.

125.    Paragraph 6.2(a)(i) of the Agreement reaches any Person engaged in "the Business or any portion of the Business" within the Restricted Area.  Lincoln is engaged in the Business, or a portion of the Business, within the Restricted Area.  Lincoln operates ACCSC-accredited, for-profit postsecondary career education serving the New York metropolitan student market.  Lincoln's Paramus, New Jersey campus offers allied-health career training programs, including Medical Assistant, Practical Nursing, and Nursing Assistant/Patient Care, that directly overlap with programs offered by Swedish Institute.

126.    By accepting employment with Lincoln as Campus President, Mr. Ruffin is "in the employ" of a Person engaged in the Business or a portion of the Business within the Restricted Area, in violation of ¶ 6.2(a)(i) of the Agreement.

127.    Additionally, as Campus President, Mr. Ruffin "participate[s] or engage[s] in the management, operation or control of" a Person that engages in Restricted Services in the Restricted Area, in independent violation of ¶ 6.2(a)(ii) of the Agreement.

128.    Mr. Ruffin's role at Lincoln replicates and expands on the functions he performed as Swedish Institute's Chief Operating Officer, including admissions leadership, staffing, and campus operations, for a direct competitor operating within the same geographic market, seeking the same kinds of customers, and regulated by the same accrediting agency.

129.    Illustrative of this competition, upon information and belief, Lincoln has bid on internet search advertising keywords associated with Swedish Institute in order to divert prospective Swedish Institute students to Lincoln, confirming that Lincoln and Swedish Institute compete head-to-head for the same students within the Restricted Area.

130.    Enforcement of the non-competition covenant is necessary to protect Swedish Institute's legitimate business interests, including its confidential and proprietary information, goodwill, and stable workforce.  Mr. Ruffin is not employed by Lincoln in a remote or non-competitive role.  He is the President of a New York-metropolitan campus, performing the same admissions and operations functions that he performed as Swedish Institute's Chief Operating Officer (and more), after downloading Swedish Institute's confidential admissions, marketing, pricing, and compensation materials and soliciting members of Swedish Institute's Admission Department.

131.    Mr. Ruffin has acknowledged the reasonableness of the "length of time, scope and geographic coverage" of the Restrictive Covenants and that they are "necessary to protect the Swedish Group's and its Affiliates' confidential and proprietary information, goodwill, stable workforce and customer relations."  Agreement ¶ 6.3.

132.    Mr. Ruffin further agreed that a breach of the Restrictive Covenants "would cause immediate and irreparable harm to the Swedish Group that would be difficult or impossible to measure, and that damages to the Swedish Group for any such injury would therefore be an inadequate remedy for any such breach."  Agreement ¶ 6.4(a).

133.    In ¶ 6.4(a) of the Agreement, Mr. Ruffin further stipulated that the Swedish Institute shall be entitled to injunctive relief for any breach of the Restrictive Covenants without the necessity of posting a bond, and agreed to disgorge and pay over to the Swedish Institute any compensation, profits, or other benefits derived from such breach.

134.    In ¶¶ 6.4(b) and 12 of the Agreement, Mr. Ruffin agreed that if any Restrictive Covenant were determined to be unenforceable in any respect, the covenant shall be enforced in part and reformed so as to be enforceable to the greatest extent, and for the longest time period and broadest geographic area, permitted by law.

135.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to a TRO, preliminary and permanent injunctive relief, compensatory damages, disgorgement of all compensation, profits, and other benefits Mr. Ruffin has derived from his breaches of the Restrictive Covenants, and attorneys' fees.

### COUNT 4: BREACH OF CONTRACT: NON-SOLICIT
### (AGAINST MR. RUFFIN)

136.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

137.    Mr. Ruffin is bound by an Amended and Restated Employment Agreement effective January 16, 2025 between him and Swedish Institute Incorporated (the "Agreement"), *see* Exhibit 1.

138.    Mr. Ruffin continues to be bound by the Agreement, for which he received adequate consideration, including continued employment, a salary of $275,000 per year, eligibility for annual bonuses, and a potential loyalty bonus of $125,000.

139.    Paragraph 6.2(c) of the Agreement provides that during the Restricted Period, Mr. Ruffin shall not

> directly or indirectly solicit, encourage or take any other action, or direct any other Person to take such action, (i) to solicit the employment or other engagement of any Person who was, as of the Effective Date or the Severance Date, an employee or independent contractor of the Swedish Group or any of its Affiliates, or (ii) solicit, encourage or induce any employees of the Swedish Group or any of its Affiliates to (x) terminate such employee's employment or relationship with the Swedish Group or its Affiliates or (y) seek to accept employment or other affiliation with

24

any other Person.

140.    While still employed by Swedish Institute, and continuing after his departure on March 16, 2026, Mr. Ruffin directly and indirectly solicited, encouraged, and took action to induce Swedish Institute employees to terminate their employment and accept positions at Lincoln.

141.    Mr. Ruffin targeted at least six members of Swedish Institute's Admissions Department and solicited them to join Lincoln.  Those targeted employees were high performers within the Admissions Department.

142.    Upon information and belief, Mr. Ruffin successfully solicited at least four Swedish Institute employees to leave Swedish Institute and join Lincoln: Ebony Williamson, Jennifer Smith, Kia Jones, and Anthony Jones.

143.    Mr. Ruffin also unsuccessfully solicited at least two additional employees, both of whom declined Mr. Ruffin's entreaties and remain employed by Swedish Institute.

144.    Those two employees will confirm that Mr. Ruffin affirmatively reached out to them to solicit their potential employment with Lincoln.

145.    Mr. Ruffin's conduct violated ¶ 6.2(c) of the Agreement because he directly and/or indirectly solicited, encouraged, and induced Swedish Institute employees to terminate their employment and accept employment with another entity.

146.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to a TRO, preliminary and permanent injunctive relief, compensatory damages, and attorneys' fees.

## COUNT 5: BREACH OF CONTRACT: CONFIDENTIALITY
## (AGAINST MR. RUFFIN)

147.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

25

148.    Mr. Ruffin is bound by an Amended and Restated Employment Agreement effective January 16, 2025 between him and Swedish Institute Incorporated (the "Agreement"), *see* Exhibit 1.

149.    Mr. Ruffin continues to be bound by the Agreement, for which he received adequate consideration, including continued employment, a salary of $275,000 per year, eligibility for annual bonuses, and a potential loyalty bonus of $125,000.

150.    Paragraph 6.1(a) of the Agreement required Ruffin to "keep secret and to treat confidentially and not to . . . permit any other Person to, directly or indirectly, appropriate, divulge, disclose or otherwise disseminate to any other Person . . . or use in any manner for its or any other Person's purposes or benefit any Protected Information." This obligation "continue[s] to exist for so long as such information remains Protected Information."

151.    The Agreement defines "Protected Information" to include "all information not generally known within the relevant trade group or by the public, including all documents, writings, memoranda, business plans, illustrations, designs, plans, processes, programs, inventions, computer software, reports, data, records, sources of supply, customer lists, supplier lists, trade secrets and all other valuable or unique information and techniques acquired, developed or used by the Swedish Group and its Affiliates in connection with their business." Agreement ¶ 6.1(a).

152.    Mr. Ruffin expressly acknowledged that the Protected Information "constitutes trade secrets and confidential and proprietary business information." *Id.*

153.    Mr. Ruffin violated ¶ 6.1(a) of the Agreement by misappropriating and retaining Swedish Institute's Protected Information. Mr. Ruffin's breaches include, but are not limited to, forwarding Protected Information to his personal email address both before and after his separation

and accessing and downloading Protected Information from Swedish Institute's systems after his separation.

154. Upon information and belief, Mr. Ruffin has used and disclosed Swedish Institute's Protected Information for the benefit of himself and Lincoln.

155. Mr. Ruffin repeatedly accessed and took Protected Information well after his employment with Swedish Institute had ended and while he was actively employed as President of one of Lincoln's campuses.

156. Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to a TRO, preliminary and permanent injunctive relief, compensatory damages, and attorneys' fees.

## COUNT 6: BREACH OF FIDUCIARY DUTY
## (AGAINST MR. RUFFIN)

157. Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

158. Mr. Ruffin, as Chief Operating Officer of Swedish Institute, owed fiduciary duties to Swedish Institute, including the duty of loyalty, the duty to act in the best interests of Swedish Institute, to refrain from self-dealing, and to refrain from acting adversely to the interests of his employer during his employment.

159. Paragraph 1.3 of the Agreement required Ruffin to "devote substantially all of the Executive's business time, energy and skill to the performance of the Executive's duties for Holdings and its subsidiaries (including the Company) (the 'Swedish Group')," to "perform such duties in a faithful, effective and efficient manner to the best of his abilities," and to "hold no other employment."

160. Mr. Ruffin breached his fiduciary duties by, among other things: (i) soliciting

27

Swedish Institute employees to leave and join a direct competitor while still serving as Chief Operating Officer and while those employees reported directly to him; (ii) orchestrating a coordinated raid on Swedish Institute's Admissions Department, targeting its top performers for solicitation to join Lincoln; (iii) directing current Swedish Institute employees to search for job openings at Lincoln while he remained employed by Swedish Institute; (iv) forwarding Swedish Institute's confidential and proprietary documents to his personal email address in anticipation of his departure and for use at a competitor; and (v) continuing to access Swedish Institute's protected computer systems without authorization after his departure to obtain and retain Swedish Institute's confidential and trade secret information, using access credentials that he only possessed and had a right to use while a Swedish Institute officer.

161.    Mr. Ruffin's misconduct while he remained employed by and was drawing a salary from Swedish Institute renders him a faithless servant and entitles Swedish Institute to, among other relief, recover all compensation paid to Mr. Ruffin during the period of his disloyalty.

162.    Mr. Ruffin's breach of fiduciary duties proximately caused damage to Swedish Institute in an amount to be determined at trial, including lost profits, costs incurred to retain and replace solicited employees, and other harm directly caused by Mr. Ruffin's misconduct.

163.    Mr. Ruffin's conduct was intentional, willful, and undertaken with a high degree of moral culpability.  Such conduct includes systematically misappropriating Swedish Institute's most sensitive confidential information, orchestrating a coordinated raid on Swedish Institute's workforce, and continuing to access Swedish Institute's protected systems without authorization after his departure.  Punitive damages are therefore warranted.

### COUNT 7: VIOLATION OF THE DEFEND TRADE SECRETS ACT
### (AGAINST DEFENDANT LINCOLN)

164.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87

28

contained above as though fully set forth herein.

165.    As set forth above, Swedish Institute owns trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839, that are related to products or services used in, or intended for use in, interstate or foreign commerce.

166.    Upon information and belief, Lincoln acquired, used, and disclosed Swedish Institute's Trade Secrets without Swedish Institute's express or implied consent.  Lincoln did that, at a minimum, through Mr. Ruffin, who is an officer and employee of Lincoln, serving as the President of one of Lincoln's campuses.  At the time of such acquisition, use, and disclosure, Lincoln knew or had reason to know that its possession and knowledge of Swedish Institute's trade secrets came from Mr. Ruffin's improper misappropriation of them.  Lincoln knew that, at a minimum, because Mr. Ruffin knew the true origin of those trade secrets and knew that neither he nor Lincoln had any right to take, possess, or use them.

167.    Lincoln's misappropriation was willful and malicious, including because its officer and employee Mr. Ruffin took through an ongoing series of secret infiltrations into Swedish Institute's system despite his contractual and legal obligations.

168.    As a direct result of Lincoln's misappropriation of the Trade Secrets, Swedish Institute has suffered and, if Lincoln's conduct is not stopped, will continue to suffer irreparable injury and competitive harm for which there is no adequate remedy at law.  Swedish Institute has also suffered and continues to suffer damages that will be proven at trial.

169.    The DTSA specifically authorizes courts to award injunctive relief to prevent the actual or threatened misappropriation of trade secrets.  Swedish Institute seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secrets and to protect other legitimate business interests.  Swedish Institute's

29

business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

170.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to a TRO, preliminary and permanent injunctive relief, damages, and attorneys' fees.

### COUNT 8: TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST DEFENDANT LINCOLN)

171.    Swedish Institute hereby repeats, realleges, and incorporates allegations 1–87 contained above as though fully set forth herein.

172.    The Agreement is a valid and enforceable contract between Swedish Institute and Mr. Ruffin containing specific restrictive covenants, including the non-competition provision at ¶ 6.2(a), the non-solicitation provision at ¶ 6.2(c), and the confidentiality provision at ¶ 6.1(a).

173.    Upon information and belief, Lincoln had actual knowledge of the Agreement and its restrictive covenants as a result of its process in hiring Mr. Ruffin as one of its Presidents.

174.    Lincoln is a sophisticated corporate entity operating in the same regulated industry as Swedish Institute, accredited by the same accrediting body, and competing for the same pool of students and employees in the New York metropolitan market.  Lincoln knew or had reason to know that a senior executive departing a direct competitor in that role would be or would be likely to be bound by restrictive covenants.

175.     Upon information and belief, Lincoln intentionally procured Mr. Ruffin's breaches of the Agreement.

176.    Upon information and belief, Lincoln actively participated in recruiting Swedish Institute employees solicited by Mr. Ruffin, and Lincoln thereafter completed the recruiting and onboarding process for those employees and hired those employees in furtherance of the scheme to raid Swedish Institute's admissions workforce instituted by Lincoln and its officer and employee

30

Mr. Ruffin.

177.    As a direct and proximate result of Lincoln's intentional procurement of Mr. Ruffin's breaches, Mr. Ruffin breached his obligations under ¶¶ 6.2(a), 6.2(c), and 6.1(a) of the Agreement, as set forth in Counts 3, 4, and 5 above.

178.    Swedish Institute has been, and continues to be, damaged by the foregoing and is entitled to an award of injunctive relief, compensatory damages, consequential damages, and attorneys' fees.

## JURY DEMAND

Swedish Institute hereby requests and demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Swedish Institute respectfully requests that this Court enter judgment in its favor and against Defendants Mr. Ruffin and Lincoln Education Services Corporation on all counts of the Complaint, and award Swedish Institute the following relief:

(1)    Enjoining Mr. Ruffin and Lincoln, and all those acting in active concert or participation with them, from further breaches of the Agreement, namely a TRO, preliminary injunction, and permanent injunction that:

   a.  Preliminarily and prospectively enjoins Mr. Ruffin, and all persons and/or entities acting in active concert or participation with him, from working in any capacity for Lincoln or any other entity engaged in the Business or any portion of the Business within the Restricted Area, in violation of ¶ 6.2(a) of the Agreement;

   b.  Preliminarily and prospectively enjoins Mr. Ruffin, and all persons and/or entities acting in active concert or participation with him, from soliciting, encouraging, or inducing any Swedish Institute employee to terminate his or her employment with Swedish Institute or to accept employment with any other person or entity, in violation of ¶ 6.2(c) of the Agreement;

   c.  Preliminarily and prospectively enjoins Mr. Ruffin and Lincoln, and all persons and/or entities acting in active concert or participation with them, from

31

disclosing, publishing, accessing, copying, or otherwise using any of Swedish Institute's trade secrets or Protected Information; and

d.  Requires Mr. Ruffin and Lincoln to immediately account for and return all of Swedish Institute's trade secrets and Protected Information, including all documents, files, and data stored on any personal device, personal email account, or any other medium.

(2)  Enjoining Defendants, and all those acting in active concert with them, from misappropriating Swedish Institute's trade secrets and Protected Information;

(3)  Ordering expedited discovery and a computer forensics protocol to determine the full extent of Mr. Ruffin's and Lincoln's misappropriation of Swedish Institute's trade secrets and Protected Information;

(4)  Awarding economic damages against Mr. Ruffin for his unauthorized access to Swedish Institute's protected computer systems under 18 U.S.C. § 1030(g);

(5)  Awarding actual, incidental, compensatory, and consequential damages against Mr. Ruffin and Lincoln in an amount to be proven at trial;

(6)  Awarding disgorgement of all compensation, profits, and other benefits that Mr. Ruffin received during the period of his disloyalty pursuant to New York's faithless servant doctrine and disgorgement of all profits and other benefits Lincoln has derived from its wrongful conduct;

(7)  Awarding punitive damages against Defendants in an amount to be proven at trial due to Defendants' willful and malicious conduct;

(8)  Awarding costs and expenses incurred herein, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) or any other applicable law or contract;

(9)  Awarding pre-judgment and post-judgment interest; and

(10)  Awarding all other relief as the Court may deem just, equitable and proper.

Dated:  July 14, 2026

**GREENBERG TRAURIG, LLP**

*/s/ Jason D. Burns*
Jason D. Burns
One Vanderbilt Ave.
New York, NY 10017
Telephone: (212) 801-9200
*jason.burns@gtlaw.com*

Fredric J. Bold, Jr. *(pro hac vice forthcoming)*
Justin K. Victor *(pro hac vice forthcoming)*
Andrew Z. Smith *(pro hac vice forthcoming)*
Clay W. Wright *(pro hac vice forthcoming)*
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Telephone: 678.553.2254
*rick.bold@gtlaw.com*
*victorj@gtlaw.com*
*smithaz@gtlaw.com*
*clay.wright@gtlaw.com*

*Attorneys for Plaintiff*
*Swedish Institute Incorporated*
